Denio,J. (Dissenting.)
The Frenchlaw, respecting the authentication of births, marriages and deaths, which was in force at the time of the alleged marriage of the intestate to Valentin Ferrié, was that which was promulgated by the National (legislative) Assembly, on the 20th September, 1792. A copy of this law was given in evidence. So far as it is material to the present question, it declares that minors cannot be married without the consent of their fathers, if living, or, if not, of their mothers'; and the age of majority is fixed at twenty-one years. It is declared that marriages contracted against these provisions are void. The marriage engagements, or bans, are to be published at the actual place of residence of each of the parties; and, in the case of minors, at the place of actual residence of their fathers and mothers. The act of publication is to be entered in a special register, which must be preserved in the archives of the municipality. It is to contain the Christian names, surnames, professions and places of residence of the future husband and wife, those of their fathers and *111 mothers, and the day and hour of publication, and to be signed by the public officer, to be proclaimed before the principal outer door, of the town hall (maison commune), eight days before the marriage, and to be posted on a tablet kept at the outer door. Persons whose consent is necessary may oppose the marriage. The opposition is to be made in writing, signed by the party opposing, and notice of it is to be given to the parties, and to the public officer, and the latter is to make a brief note of it in the register of publications. The validity of the opposition is to be determined by a juge de gpaix, who is to decide in three days, and there is an appeal to the tribunal of the district, which must give judgment in one week. A note of the judgment is to be made in the margin of the record ' of opposition, in the register of publication. The law then provides for the forms to be used by the parties and the officer, in'concluding the actual contract of marriage. The parties are to declare that they take each other in marriage, and the public officer is to pronounce that they are united in marriage. The act of marriage (or legal document evidential of the transaction) is to be drawn up by'the officer, and is to contain, besides the names and residences of the parties, a number of particulars arranged under six separate heads, including a statement of the consent of the persons whose consent is made necessary, and is to be signed by the parties and officer, by four witnesses, and by the relatives present. It is to be inscribed in duplicate registers, provided by the municipality; one duplicate is to be preserved in the municipal archives, and the other to be kept in the archives of the department.
It does not appear to me necessary to inquire what would be the effect of a marriage actually concluded without the observance of these formalities, or without the consent of parents where the parties or one of them were minors, since the question now presented is whether these parties were married at all. If an actual marriage were shown, and the married parties had subsequently cohabited together with the knowledge of the parents, the offspring would, I presume, be considered legitimate, notwithstanding the strong declaration of the law, that *112 marriages contracted against its provisions should be void. Indeed, I think the intention of the law is to conclude the parents, where they neglect to interpose objections after being duly notified of what is going forward, by the publication of the bans in the manner stated. The French civil code, called the Code Napoleon, promulgated in 1803, declared that a marriage contracted without the consent of parents, where such consent was necessary, could only be impeached by the parties whose consent was requisite, or by such of the two married persons as stood in need of such consent; and that it could not be questioned at all on that ground, where it had been approved expressly or tacitly by those whose consent was necessary, or when a year had elapsed without complaint on their part subsequently to their knowledge of the marriage. (Book I, Title Y, Articles 182, 183.) These provisions may not be specifically applicable to marriages contracted under the law of 1792; still, if it could be shown that these parties were actually married before the birth of the respondent, though no evidence of the consent of the father of the husband could be shown, there would be so strong a presumption of 'his acquiescence that the issue would be held legitimate. But in prosecuting the inquiry whether the parties were really married, the provisions of the law of 1792 furnish important aid. It is quite clear that Ferrié, or those who acted in his behalf in the publication of the bans, were acquainted with the provisions of the law, and had a general intention of conforming to them. The entry, or act of publication, as it is called, states on its face that it is made “in execution” of that law, which is referred to by its date, and it contains, with considerable, though not precise accuracy, the several matters required to be stated. We have, then, this state of facts satisfactorily established: an illicit intercourse between these young people, about to result in the birth of a child; a desire on their part to be married, opposed by the father of Ferrié, the intended husband, and a condition of the law of the country which would render his opposition entirely effectual if it should be exerted, but which he might waive either by express consent or by silent *113 acquiescence on being legally notified, by the publication of the bans, of the attempt of the parties to be married. Then there is a day fixed for the celebration of the marriage, and the notice required by law is given by public proclamation, and. by posting up in the town hall, in the place where the parties and the father of the proposed husband dwelt.
In this statement of the circumstances surrounding the alleged marriage, I have assumed that Valentin Ferrié was a minor, and therefore subject, in this respect, to the will of his father. The record states that he was nineteen years old. This seems to me very satisfactory evidence that he had not attained his majority, though I observe that, in the opinion of the Surrogate, it is suggested that he may have been of age, and that the statement in the entry may be erroneous. I do not feel the force of the suggestion. Besides the general presumption in favor of a fact stated in a contemporaneous written document, prepared at the instance of a party to whom the fact was known, there are special reasons for confiding in the correctness of this record of Ferrié’s age. He wished to be married, and caused the publication to be made for that purpose. If he could have truly stated that he was of lawful age, no opposition arising out of the want of parental consent could be made. He had thus a very strong motive for declaring himself to be of age, if he could do so consistently with the truth; for then the known repugnance of his father to the marriage would be of no avail. But he caused himself to be published as a minor, and thus admitted that his marriage could be prevented by the opposition of his father. But there was a misstatement as to the age of the proposed wife, which was set down as twenty-one years, when she was actually twenty-three, as is shown by the registry of her birth, and it is urged that a mistake might just as readily have occurred in respect to his age as to hers: but the argument that because an error is shown, the other statements are incorrect, would not be a cogent one in any case, while here circumstances exist which show a motive for an understatement of her age. She was, on the assumption that the record is accurate in the parts in which it is *114 not contradicted, about to marry a man some years her junior, and would naturally be disposed to make the difference appear as small as possible. Reducing the disparity would be likely to advance the marriage, by deceiving his relatives, and .could not prejudice it in any way. The fact that she was born in another town, would enable her to -do this without fear of detection, which would not be the case as to Ferrié’s age, the publication being in the place where he was born, and had always lived and where he had a numerous kindred. Besides, she had habitually claimed to be younger than she was. In her French passport, granted in 1815, when she was thirty-eight years old, she caused herself to be described as thirty. In her contract of marriage with Du Lux, in 1812, when she was thirty-five, she was stated to be thirty-two; and to witnesses in Hew York she stated that her child, by which, she was understood to mean the respondent, was born when she was only fifteen, whereas she was then twenty-three. The Surrogate considers that the record is contradicted in this respect by the testimony of the witness, Daflis, and by Catharine Ferrié. The former, who stated he was seventy when he gave his testimony, had been a soldier of the first Empire. He said, in a general way, and apparently without any reference to the bearing of the testimony upon the integrity of the statement in the register of publications, that Ferrié was six' years older than he was. Catharine Ferrié, widow of another Daffis, was Valentin’s sister. She said she was sixty years old and, in the same incidental way, that Valentin was twenty years her senior, which would make him twenty-five at the time of the publication, which, upon all the evidence, is highly improbable. She was apparently an ignorant person, unable to write, as she signed her deposition with a cross • and her statements of time were quite inconsistent with her account of the difference between her brother’s age and her own. She speaks of herself as being about ten years old when the child of Valentin by Jeanne Icard was born, which, if true, would make her sixty-five at the time of giving her testimony, instead of sixty, as she supposes. If is evident that no confidence can be given to these *115 statements, as to the age of Valentin, and they cannot, in my opinion, be considered as impairing at all the authenticity of the statement in that respect, in the entry of the publication of bans.
Recurring, then, to the condition of things existing at the time of the publication of the bans, what conclusion ought to be drawn from the cancellation of the entry in the official register ? The law, it has been shown, provides that where objections are made, they are to be noted in the registry of publications, and to be summarily tried and adjudicated, and the judgment noted in the margin of the entry of the opposition. The argument on behalf of the respondent is, substantially, that the cancellation of the record should not be regarded, because no opposition is noted in the register, and there is no mention of the judgment in the margin. B.ut it must be remembered that the father of Valentin had an absolute right to forbid his marriage until the latter should arrive of age, and that he was opposed to it to such a degree that he turned his son out of doors for persisting in it. He had only to signify his opposition to the proper officer, to render it impossible for the marriage to go on. In such a case it would be unlikely that the forms should be followed out. They were provided for cases in which there should be something to try, and where the parties on both sides should persist in litigating the point. In this case there could be no contest, for the facts were notorious and indisputable, and the right of the father to forbid the marriage was perfect. The natural and probable course in such a case would be for the son, on being notified that the father had taken the legal steps to oppose the marriage, to stop short in his- proceeding. The law made it necessary that the' act of opposition should be signified at the domicil of the parties to the marriage. Hence, Ferrié would regularly be served with,-the proper document. We find that the person in charge of the archives of the municipality not only.canceled the entry of publication by drawing lines across it, but wrote in the margin the word “ neani,” which imported, in that position, that the record had become futile and void—literally, that *116 it amounted to nothing. It seems to me to be precisely such a disposition of the original entry as would be likely to be made if Ferrié had yielded without litigation to the opposition interposed by his father, which he found it impossible to resist, and had so informed the official person entrusted with the records. There is no ground for suspicion upon the evidence that the cancelation was officiously made by any person other than the keeper of the records. They are found in proper custody, and the lines and marginal entry are apparently of the same period as the act which they are intended to cancel. In addition to this evidence that the attempt to marry according to the forms of the law of 1792 was abandoned, there is the absence of any record of the act of marriage. This document, as has been shown, was required to be inscribed upon duplicate registers, one of which was to be preserved in the archives of the municipality, which are kept at the* maison commune. The mayor of St. Girons certifies that the civil acts of marriage, celebrated in that commune, exist in the archives of the city from the year 7 of the Republican era (which ended the 22d September, 1798), down to our own times, and that there is no entry among-them of a marriage between Valentin Ferrié-and Jeanne Icard. There has been, I think, since 1792, somé change in the French local territorial divisions; but it appears that in 1855, when the commission in this case was executed, records of the civil acts of marriage of the commune and of the arrondissement of St. Girons were deposited among the archives of the tribunal of Premiére Instance of the arrondissement; but it also appears that these records do not extend further back than 1st Vendemiaire of the year 11 of the Republic, corresponding with September 22, 1802, and that no record of the marriage in question is contained in them. There does not appear to be any public office besides this where the other duplicate register would be properly deposited. However this may be, when it is shown that the register preserved in the mayoralty of the commune, which was the primary place of deposit, for the proper year, does not contain any record of the asserted marriage, it cannot *117 be necessary to seek for the other duplicate original; for that one, if correct, would, of course, be identical with the one so preserved. The evidence of the destruction of certain records by fire, in the year 7, is of no materiality upon this point of the case, as that year ended in September, 1799, and there is no pretense of a marriage anterior to the publication of bans in May, 1800. That proof seems to have been given to account for the absence of the record of the birth of Valentin.
Thus far, the evidence shows an attempt by the parents of the respondent, a few weeks before his birth, to effect a mar riage according to the forms of the written law of the country, and that that effort was abandoned by the cancellation of the initiatory document, the act of publication. That no marriage took place, according to these forms, is conclusively shown by the absence of any entry of the act of marriage in the register which would regularly have contained it, if it had ever taken place. The parties continued to reside at St. Girons until after the birth of the respondent, and the law required the act of marriage to be recorded at the maison commune of the residence of one of the parties. The appellant has, however, shown, in addition, the absence of any record of their marriage in the several communes in which Jeanne Icard was known to have previously resided.
In a research of this character, .contemporaneous written documents afford a degree of satisfaction beyond any other species of evidence; and, accordingly, the parties have, with great propriety, introduced the record of the baptism of the respondent from the baptismal record of the parish church of St. Girons, signed by the curé. It states that he was born and baptized the 30th June, 1800. His name is given as Balthazar Pierre Ferrié, “son of Valentin and Jeanne Icard:” the godfather, as is stated in the paper, was Balthazar Ferrié, and the godmother Bose Ferrié. The first question which arises upon this paper is, whether the presentation of the child for baptism, and the administration of that rite, of themselves furnish any evidence in favor of legitimacy. If none but legitimate children were admitted to baptism in Catholic countries, or if it *118 was unusual to baptize children born out of wedlock, there would be a presumption in favor of the respondent. But this is not the case. Baptism being the initiatory rite required for admission into the church, and considered generally necessary to salvation, is administered to all infant children, the offspring of Catholic parents, without regard to the social condition or legal status of the latter or their own. This is matter of general intelligence, and it is confirmed by the evidence of a French Catholic priest, from which it appears that illegitimate and legitimate children are indiscriminately presented for baptism. The ■ other inquiry is, whether the argument in favor of legitimacy is supported by anything contained in the record of baptism. There is a suggestion that the statement that the respondent is the son of Ferrié and Jeanne implies that he was legitimate, because a child born out of wedlock is fillius nullius, and could not properly be called the son of any one. This, it is true, is a maxim of the English common law, but it was not very likely to have been known tó, or acted upon, by a priest of a provincial town in France, bio doubt, the description of the child as the son of Valentin is satisfactory evidence of his natural filiation; but I think it does not, of itself, in the connection in which it is here found, prove anything more. But there is the absence of any statement that the child was legitimate; and the mother is not described as the wife of Valentin. The child is simply mentioned as the son of Valentin [Ferrié] and Jeanne Icard. ' There is not much direct evidence as to whether it is usual for the record to refer to the status of the baptized. child. The French priest before mentioned, who had officiated five years in Brittany, says his practice was to describe their condition as legitimate or illegitimate, according to the fact,, where it was known. In the records of baptism incidentally given in evidence for other purposes, it is invariably stated that the child was legitimate. Thus, in the baptismal record of the intestate, Jeanne Icard, in 1777, she is described as the legitimate daughter of Jean Icard and Magdalen Riviere; and her brother Alexis was christened as the legitimate son of the same father and of Magdalen Riviere his spouse, and her half- *119 brother Benoit as the son of Magdalen Biviere married to Antoine .Dezeille. The same practice seems to have prevailed in the records of marriages. In that of the parents of this intestate, in 1774, the married parties are each described as the legitimate children of their respective parents; and in the betrothal and the contract of marriage of the intestate and Du Lux, at the French consulate in New York, in 1812, the legitimacy of both the married parties is stated. I have not thought it proper to consider the evidence upon this point contained in the additional testimony produced by the appellant to the Supreme Court, while this case was pending there upon appeal; being of opinion that it can only be reviewed upon the proofs which were before the Surrogate. But, upon the regular proofs it appears that the practice, to say the least, was quite common to insert the fact of legitimacy in such entries when it could be done consistently with the truth. In such documents prepared here, and relating to citizens of this country, a direct statement that the child was legitimate would not be usual, though, if the parents were named, the mother would naturally be described as the wife of the other parent. In this case, the statement that the baptized child was the son of Valentin Ferrié and of Jeanne Icard, without adding, his wife, does not convey the idea of the marriage of the parents or the legitimacy of the offspring, if it does not suggest the contrary inference. I do not attach, any importance to the use of the maiden name of the mother, for I understand that to be a common usage in France. But the absence of any statement showing that the parents were married to each other affords, in connection with the usage which has been mentioned, some evidence that they did not pretend to have entered into that relation. And this presumption acquires additional force from the consideration of the other circumstances of the case. If these persons were ever married, it was within two months of the birth of their child and of this baptismal ceremony. During the greater part of the period of gestation, their connection had been notoriously illicit, and on the 4th of May they were confessedly unmarried. That they desired that their child, *120 when born, should possess the status of legitimacy, is evident from the publication of the bans. If that act had been followed up by marriage before the birth of their offspring, it could scarcely fail to be known to the priest of the parish; and, if known, it is not easy to conceive a reason why the usual form of such instruments was departed from, when the effect of the change would be to conceal or render doubtful a fact well known to all connected with the ceremony, and the perpetuation of which would be of importance to the character of the family and the interests of the child.
But the godfather and godmother were Balthazar Ferrié and Bose Ferrié. The testimony does not afford any clue to the last named of these persons, except that her name indicates that she was probably related to the father of the child. But the Christian name of the father of Valentin was Balthazar; and if he was the person who stood up as godfather, it would lead to an inference of some strength that he had waived his objections to a union between his son and the mother of the respondent, and something of what has been said would be inapplicable. It would not by any means be conclusive upon the point, for the father of Valentin might be willing to assume the imperfect obligation of a sponsor to his son’s illegitimate offspring, when he would not be willing to see the son united in marriage to its mother. Still, it would be a circumstance of some weight; and it is, therefore, an important inquiry whether it was the grandfather or some other Balthazar Ferrié who stood up as godfather at the baptism of the respondent. The Surrogate inclines to the opinion that it was the grandfather, and says that the fact, if true, would prove not only his consent to the marriage, but the legitimacy of the child. The respondent’s counsel have not insisted on that view, and it is not sustained by the evidence. It was shown that there was another Balthazar Ferrié of St. Girons, a relative of Valentin, who was of a suitable age to have been the godfather. One Victor Ferrié, of St. Girons, a tanner, 42 years of age in 1855, testified that his father and the father of J. P. Ferrié, the respondent, were own cousins, and that, when the respondent was at *121 St. Girons, in 1821, he went to'learn the tanner’s trade with the witness’s said father. Thus far, his first name is not given; but we learn from the witness Yidal, who was sixteen or eighteen years old when the respondent was at St. Girons, in 1821, and who was, as he says, his intimate friend, that the name of the person with whom he went to learn the tannery business was Balthazar Ferrié. One who, in 1821, had a son eighteen, or even sixteen, years old, had at least arrived at years of understanding in 1800, and might well enough be received as godfather.of the child of his cousin, who was of about the same age. J. P. Daffis also swears that the respondent lived at Balthazar Ferrié’s; and I understand this to refer to the same period spoken of by Yidal, namely, in 1821. Daffis also says, in another connection, that there was a Balthazar Ferrié then (at the time of giving his testimony) at St. Girons, who was the godfather of the respondent. The respondent’s grandfather died in 1822, so that he could not possibly be the one referred to by Daffis. This question is a little complicated by the fact that there was yet another Balthazar Ferrié, who was called as a witness. He was a cousin-german of the respondent, and was born in 1809." He could not be the person referred to by Daffis as the godfather, for he was not born until long after the baptism. Neither could he be the person with whom the respondent went to learn the tanner’s trade in 1821; for he was then only twelve years old. Besides, he was not a tanner, but a merchant and manufacturer, and he was an own cousin of the respondent; whereas the one with whom he served as apprentice at the tannery business was his second cousin—their fathers being first cousins. In the testimony which the respondent gave on his own behalf, he swore that his godfather was his father’s brother. He, of course, referred to what he had understood; but it was, no doubt, a mistake, for his father does not appear to have had a brother of that name. The records at St. Girons had not been found when he was examined, and he was not subsequently recalled. The only material influence of his testimony, on this point, is to show that he had never heard that his grandfather was- his sponsor *122 at his baptism. It appears to me to be the certain result of the evidence upon this point, that it was not the father of Valentin, but a collateral relative, whose name is mentioned in the baptismal record.
The fact that the respondent was baptized in the name of his father, and that he ever after retained that name, has been very properly adverted to; and it would, not be without its influence in a case otherwise doubtful. But it does not furnish a very cogent argument in his favor, under the actual circumstances. An illegitimate child is not entitled to the name of either of his parents; and yet he must be furnished with a name by which he may be known. If the natural father is not known, or will not acknowledge his offspring, the mother’s name is generally employed, as it is always certain that the child descended from her, though the father should be uncertain. But where the father acknowledges the paternity, as wás the case here, and the fact is otherwise notorious, I suppose it would ordinarily happen that the child would be called by his name, though it were known that he was not married to the mother.
These considerations have led me to the conclusion that no inference favorable to legitimacy can be predicated of the record of baptism. I think, on the contrary, that the mention of the names of the parents, without any hint that they were husband and wife, and the absence of any other language qualifying the respondent as legitimate, when the marriage, if there'had been one, was so recent, and its existence was'so important to remove'from the parties the stain of a disreputable connection and confer an honorable status upon the child, and when the document is one in which it was usual to affirm legitimacy where it existed, go far to disprove the position which the respondent seeks to establish. The just conclusion, it seems to me, from these two pieces of written evidence, which are coeval with the transactions .to which they relate and have come down to us through a period of sixty years, is, that these parties, shortly before the birth of their child, sought to be married according to the laws of the country, but were pre *123 vented from, doing so by their inability to obtain the consent of the father of the proposed husband, without which they could not lawfully be married; that the proceedings instituted for that purpose then fell to the ground; and the child was born' of parents who had never been united in wedlock.
But, strong as these inferences seem to be, they are not absolutely conclusive. A marriage may by possibility have taken place; and acts of recognition by the parties, matrimonial cohabitation, and general reputation, are always received upon the question of marriage, where positive proof is unattaina ble. There are strong cases where alleged marriages have been established upon such evidence, where the direct testimony tended somewhat towards a different conclusion. (Starr v. Peck, 1 Hill, 270; Piers v. Piers, H. L. Cas., 331.) It is urged, on behalf of the respondent, that evidence of that character exists in this case, sufficiently persuasive to overcome any doubt which may be supposed to arise upon the more direct testimony. This renders it necessary to examine the conduct of these parents towards each other and towards their child, from its birth to the death of the mother, and to inquire as to .the reputation which obtained in the localities where they were known on the question as to their marriage and their child’s legitimacy. The outline of their history shows that the respondent was put to nurse by his mother immediately after" his birth, and was afterwards neglected by both parents until he was about fifteen years old, when he was sought out and reclaimed by the mother, who afterwards exercised a kind of oversight respecting him, in France, until, at the age of about twenty-four, he was sent to this country, whither his mother had removed several years before; and that from thence, until her death, an intercourse and correspondence existed between them, sometimes of a kindly and sometimes of a hostile character. Soon after she reclaimed him, in 1815, and ever afterwards she gave out that he was her nephew, and never publicly owned him as her son, though she several times privately admitted-to different individuals that she was his mother. As the counsel for the respective *124 parties deduce very different inferences from the testimony," it will become necessary to examine portions of it more particularly. I will first consider that which is connected in time with the respondent’s birth, and embraces the period shortly before and shortly after that event. The point to be determined is, whether the respondent’s parents were reputed to bo married, or conducted themselves as though they were. The space of time occurring before the marriage to which the inquiry relates is, of course, very brief, it being entirely clear that the commencement of their intercourse was illicit, and that they were not married as late as the 4th day of May, 1800, when the act of publication of bans was entered upon the municipal records of St. Girons. Prior to that time, there could not well be, and there was not, in fact, any reputation that they were married. If there had been, we know it would be . contrary to the fact. To render the respondent legitimate, the marriage must have taken place between that time and his birth, on the 30th day of June following. I have already sufficiently spoken of the effect of the written documents, and am now to examine the parol evidence. The testimony was taken in 1855, and the difficulty attending such an inquiry, more than half a century after the period to which it relates, is painfully apparent. The course adopted to obtain the testimony was certainly the best which could have been pursued. Two intelligent members of our bar, acquainted' with the French language, and invested with the quality of commissioners, were sent to the locality, with instructions to examine all persons who could be found who should be likely to possess information upon the point in dispute. I infer from what passed on the argument that one of them was interested professionally for each of the litigant parties; and such an arrangement was well calculated to promote a searching investigation upon the contested questions involved. As might be expected from an inquiry conducted without a prior acquaintance with the facts, a large portion of the testimony is wholly unimportant. I lay out of view what has been sworn to by the witnesses at Massat and Biert, who only knew the intestate prior *125 to the time she went into the service of M. Anére at St. Girons, about the year 1798. Among those who resided and were examined at St. Girons, there were only two who were of sufficient age in 1800 to know anything of the relation between Valentin Ferrié and the deceased. One of them, Jean Paul Daffis, an ex-officer of the army of the first Empire and a Chevalier of the Legion of Honor, was seventy years of age when examined, and was consequently about fifteen at the time'of the birth of the respondent. He swears that he knew Jeanne Icard at-the time she lived, as a servant, at Anére’s, whose house was just opposite the house of the witness; that he likewise knew Valentin Ferrié, who, he says, was his associate, they both being tanners; and he continued to be acquainted with him until he left St. Girons for Spain some years after-wards. He further says that Jeanne had a child by Valentin, which was born and baptized at St. Girons; that before its birth he kept company with her, and that the father of Valentin said she was Valentin’s bonne amie, and that the latter stole leather from him, the father, to get money to give to Jeanne; that the father was very much opposed to a marriage between them, because she was only a servant and his family was in a comfortable position; that, when Jeanne was about to be delivered, she left Anére’s for another house next door, to lay in, as he understood; and the next day he inquired, and was told she had become the mother of a boy. As to the question of marriage and legitimacy he says, “ I do not know whether there was any reputation of the rqarriage of his parents.” “I don’t know whether the child was legitimate or illegitimate. The general report was, ’twas a natural child. The father of the child never spoke to me of his relations towards the child. He never told me that he was married to Jeanne Icard, or that he was not married to her. He never said anything to me about it.” The other witness who was contemporary with the residence of the deceased at St. Girons is Margot Labat de Galai, an unmarried woman of about eighty, who seems always to have lived at St. Girons. She says she knew Jeanne Icard when she lived at Anére’s as a servant, and was present at her *126 accouchement, arriving justafter the birth of the child, and that she was her intimate friend. She also knew Valentin; and upon the question of their marriage she says: “I don’t know if he was married to Jeanne Icard. I don’t know that he cohabited with her as husband. Valentin lived with her some time before and some time after the accouchement. They lived together as if théy were husband and wife. I don’t recollect precisely, but it was over two months.” “I understood that they [Jeanne and Valentin] wished to be married. Whether they were married or not, I do not know. He (the child) only passed as her son at St. Girons.” uThe child of Jeanne Icard, I don’t know if it was legitimate or not. I don’t know if they passed as husband and wife, or as lovers. I never heard of a marriage existing between them,” She proves that the accouchement took place at the house of M. Benóz, at St. Girons, “ at the entrance of the city;” that she went there to be confined. She declares that she has heard her called Madame Ferrié by the people of the quarter in which they- lived, and by M. and Mme. Anére. She says she was employed by Mme. Anére to take things to Jeanne, and that her direction was to take them to Jeanne Icard.
There is another class of witnesses who saw the deceased, the respondent’s mother, at St. Girons and the neighboring villages at a later period, whose testimony has some bearing upon" the point of the reputation as to her marriage. In 1815, after she had lived in Hew York eight or nine years, and had been married to Du Lux, she made a voyage to France, sought out and found the respondent, where he was living with poor people in the lower Pyrenees mountains, claimed and took him to Bordeaux and placed him at school; but he ran away and went back to the mountains, taking St. Girons in the way. He was again reclaimed on her behalf through the instrumentality of persons employed by M. Cattelan, her agent at Bordeaux, and this time was placed at St. Girons with M. Anére, the same person with'whom she had lived, as a servant, fifteen or sixteen years before. There he remained until April,' 1821, when he went to Bordeaux, and was under the charge of Cattelan. The *127 latter part of the time he was at St. Girons he served as a tanner’s apprentice with a kinsman of his own family name, as has been already mentioned, in connection with the inquiry as to the identity of his godfather. In the course of the journey of Mme. Du Lux, in 1815, to find the respondent, she was at St. Girons, Massat and Biert, places where she had lived in her youth. The witnesses now to be spoken of, saw her during these visits. The time, it will be recollected, was about fifteen years after the alleged marriage and the birth of the respondent. It may be supposed that the character of her connection with Valentin Ferrié was still remembered, to some extent, at and in the vicinity where it took place. Marie Pages resides and was examined at Biert. She was born in 1787, and knew Jeanne when she lived at Biert, and heard of her return many years afterwards to look for her child. She had never heard of her marriage or of Ferrié; but she says it was public report, and known to everybody, that she had a bastard son. She admits that she knew it only by tradition, and had not heard of it until after she thus came back to look for her child. Gerons Victor Ferrié, of St. Girons, is a son of the Balthazar Ferrié with whom the respondent was put to learn tanning in 1821, the latter part of the time he lived at St. Girons. The witness was only eight years old at that time, but he says that the respondent was always regarded as illegitimate; but he admits that he had so heard principally since the death of his mother. J. M. B. Vidal, of St. Girons, born in 1805, swears he was an intimate friend of the respondent when he lived at Anére’s, and while he was endeavoring to learn tanning with Balthazar Femé. He was asked, “Was this John P. Ferrié considered as legitimate or illegitimate by the people generally at that time ?” and answered, “I have heard that he was a natural son of Jeanne Icard. I heard it from all the world (de tout le monde): it was the report at this place before he left for Bordeaux. I cannot remember any one who told me so.” It detracts from the weight of this testimony that the witness thinks he remembers . Jeanne Icard when she was a servant at Anére’s, which was *128 before he was born: Pauline Bigourdan, of St. Girons, born in 1805, swore she was a niece pf Anére, and frequented his house, and frequently saw the respondent when he lived there. On the point of marriage and legitimacy she says: “ I don’t know if she [Jeanne] was ever married with any one named Ferrié. I always heard the contrary.” “I heard' that the child was illegitimate. I heard it when she came to seek the child. I heard that this woman, who had been a servant here, had a child, and had come to take it away. I cannot remember any one who told me so. I have heard my uncle speak of the child as illegitimate. I have heard my aunt speak of the child as illegitimate.” She further said, in answer to a direct question, that she had never heard any report of the child’s legitimacy. Balthazar Ferrié, a son of Alexis, the brother of Valentin, and hence (naturally) the cousin-german of the respondent, was examined at St. Girons, where he lived, and said he was born in' 1809. He was consequently about six years old when the respondent was placed at Anére’s, and twelve when he left St. Girons in 1821. He swears he knew him during that period; that he was reputed to be the child of Valentin Ferrié and Jeanne, who had lived as a servant at Anére’s, and to be illegitimate. Catharine Ferrié (widow of one Daffis), and an own sister of Valentin, lived and was examined at Castillon, a village in the neighborhood of St. Girons. She said she was sixty years old, and lived at St, Girons until the age of twenty, when she was married and went to live at Castillon. Taking her statement of her own age and of her marriage, and the statement of Valentin’s age in the record of the bans, she was five years old at the respondent’s birth, and was married about the time he was brought from the mountains to live at Anére’s. It is impossible to say how far she means to speak from recollection and how far from hearsay. She says she is sure Valentin was never married at St. Girons; that he occupied a chamber with a girl called Jeanne, who had lived with M. Anére, and who was his bonne amie, and was recognized as such by his family, and was not his wife; that he wished to marry her, but their father and the family were opposed to it, and he left the house, *129 Ms father refusing to hold any relation with him, and forbidding the children to see him, because she was only a servant and they were in good circumstances; that he had a child by her, which died young, as she says she had heard. She said that her brother and Jeanne disappeared from St. Girons about the same time; she, however, leaving a few days betore him. Her account, therefore, corresponds substantially with the other witnesses, except as to her belief that the child died, in which she was, of course, mistaken. Her disagreement with the other witnesses and with the known fact in this respect, impairing, as it does, in some degree, the confidence to be reposed in her testimony, shows, at the same time, that there could not have been a mutual understandmg among the witnesses as to their testimony. Without confiding too much in the testimony of an uncultivated witness as to events which took place at a remote period, I still think that we may safely credit her statement as to the understanding in the family touching the connection existing between Valentin and Jeanne at the time of the birth of the child. Her mistake as to the early death of the child is 'the less remarkable when it is remembered that all the testimony shows that the respondent was taken from St. Girons into the country immediately after its birth, and was not seen again in that city until 1815, when the witness had removed to Castillon. Pierre Eibat, of St. Girons, was sixty years old when examined in 1855, and was consequently fourteen years younger than Valentin, whom, however, he says he knew well, and who, according to Mm, left St. Girons in 1809, to go to Spain; that he, the witness, parted with him at Bayonne m 1811, ValentM going to Spain, where, as reported, he afterwards died. He never heard that Valentin was married, and says he could not have been married at St. Girons, or he should have known it.
I have stated all the testimony upon wMch a recogmtion of the alleged marriage by the parties to it among their friends and acquaintances, or in the community in which they lived, or a reputation that they had became husband and wife, can be affirmed. If the appellants were obliged to overturn a *130 prima fade case of marriage established by the respondent, the evidence might not be considered conclusive; but if the onus is regarded as resting on the respondent, it cannot be said that it tends at all to establish the issue. Its tendency certainly is to show that the connection between the respondent’s parents was not only illicit in its commencement and for a considerable period afterwards, as it is conceded to have been, but that it never became otherwise by the celebration of a marriage between them. If there was a marriage it is certainly remarkable that among so many persons who knew, or had heard of the illicit connection, and of the fruits of it, not one should ever have heard' of a marriage. Margot Labat is not an exception to this remark. Her testimony is more favorable to the idea of a marriage than that of any other witness, because, if she is not. mistaken, she heard Jeanne addressed or spoken of as Madame Ferrié, an appellation indicating that those who used it considered her his wife; and yet, though she was a companion and intimate friend of Jeanne of about the same age, was with her in her confinement, had known of the desire of Valentin and her to be married and had always lived at the same place, she never heard of a marriage existing between-them.
I do not think there can be any just suspicion that the witnesses were in collusion with the French claimants of the succession or have a desire to favor them at the expense of the other party. ■ The Caujolles reside at Biert, are country people and apparently unknown, to the witnesses residing at St. Girons and Castillon, .while several of the latter belong to the family of Ferrié, and cannot be supposed to be unfriendly to one naturally descended from, if not legitimately connected with, that family.
. The substance of the remaining ■ testimony may be stated briefly.' The respondent was sent into the country to be nursed, and Valentin and Jeanne soon after left St. Giron's either together or 'separately; it is not certain nor very material which. There is a hiatus of three or four years in their history, or at least in that of Jeanne, at the end of which she is found residing at *131 Toulouse, and engaged in an amorous epistolary correspondence with Du Lux who lived at Bordeaux. The first of his letters is dated in May, 1804, and from that and subsequent ones it is apparent that their connection was of some standing. She was addressed as Mademoiselle Jeanne Icard, and although there are a good many of his letters to her preserved, there is no allusion in any of them to her connection with Ferrié, or to her being the mother of a child. As to Valentin it seems probable that he remained somewhat longer at St. Girons, but he eventually became connected with the French army in the Spanish Peninsula, and is supposed to have been assassinated by banditti in or after the year 1811. There is no vestige of any correspondence between Valentin and Jeanne after the birth of their child. It is probable that their connection continued a short time at St. Girons, as it is said that they visited their child together at its nurse’s. There is no evidence that they ever saw, or took any interest in, each other after they thus separated. She never claimed him as her husband or spoke of him as such, and he was equally reserved as to any marital claim on her. There is no evidence of any disagreement or quarrel between them and no apparent reason for their separation, unless it be that they had no conjugal rights respecting each other. She and Du Lux lived together in a state of concubinage at Bordeaux, until they came to New York together, or nearly at the same time, in 1807., They continued to live together there in the same way until 1812, when, at the suggestion of a countryman, M. Deguerre, they were married civilly at the French consulate, and with the forms of religion in a Catholic church. By dealing in articles of millinery, she acquired considerable wealth. In the meantime the respondent, the fruit of the connection between the intestate and Valentin Ferrié at St. Girons, was lost sight of. He was transferred from one poor family to. another in the mountains, where he was brought up in poverty and ignorance. No inquiries seem to have been made concerning him by either of his parents until 1812, when Du Lux made a voyage to France; apparently to make purchases in the line of their *132 business. He, however, seems co have been charged with the duty of endeavoring to find the' respondent, who was called “ Mrs. Du Lux’s nephew,” as is obvious from the letters he wrote to her during his absence. From these it appears that he wrote to Anére at St. Girons, who promised to make- a thorough investigation as to the respondent. But it was without result, for Du Lux states in a letter to his wife, in which he mentions having engaged his passage for his return to the United States, that there was nothing positive to acquaint her with about the fate of her nephew. He went to France again in 1814, but there is no evidence that he prosecuted any farther the effort to find the respondent. He never returned to America, a difference having arisen between him and his wife respecting some pecuniary matter; and he is supposed to have died many years ago.
The next year she went out to France, found her son in the mountains as has been mentioned, and brought him to Bordeaux, and, after he had escaped, caused measures to be taken, through M._ Cattelan, as has also been mentioned, which resulted in his being placed with Anére, at St. Girons. A large number of letters from Cattelan, the draft of several from her to him, and one written by Anére to Cattelan, were given in evidence. In all of these, even in that of Anére, the respondent is spoken of as the nephew of the intestate, and the same is true as to the letters of Du Lux to Ms wife. While the respondent lived at Bordeaux, and after he came to the United States, and when living . in Baltimore and at Cincinnati, the letters which passed between Mm and Ms mother, which, together, are numerous, refer to him as her nephew, and to her as his aunt; and when, on one occasion, a letter which was written to her in his name by one of his friends addressed her as his mother, she fell into a violent passion, wMch produced a humble apology from him. Whether Du Lux or Cattelan knew of the true relation between her and the respondent, is uncertain. Anére must, of course, have known it. The people at St. Girons appear to have recognized him as her illegitimate son. It is probable *133 that the respondent suspected, at least, the relationship to be different from that which she publicly gave out, for he swears that she claimed him as her son when she found him in the mountains; but in his petition to the Surrogate he speaks with some hesitation as to the nature of the consanguinity existing between them, for the statement is: “I am the sole heir-at-law of the said Jeanne Du Lux, and believe that I am the only child of said Jeanne Du Lux, and know that said Jeanne Du Lux has at times acknowledged me to be her only son, and has at other times addressed me and spoken of me as her nephew.” It is enough for my purpose to show, as I have done, that she sought to impress upon the public and her acquaintances generally that their relationship was that of aunt and nephew. He was really her son according to the course of nature; but she virtually repudiated that relationship while she recognized him as a nephew—a position to which he had no right. This would be natural and consistent if the actual relationship was one which could not be creditably avowed, and if she desired, nevertheless, to account in some reasonable way for the care and patronage which she proposed to extend to him. Upon the supposition that he was legitimate, it is more difficult to account for her conduct in this respect. Several theories were suggested by the respondent’s counsel, and, among others, that her separation from his father was the result of a quarrel, which had so embittered her against him that she would not own him as the father of their child. But there is no evidence of any such quarrel or of any disagreement, or that they separated for any other reason than that there was no legal tie to bind them together. Again, it was suggested, and the evidence affords countenance to the idea, that she did not consider his'personal appearance to be such as to reflect credit upon her as his mother, and for that reason she disowned him as a son; but it clearly appears that the idea of treating him as a nephew and not as a son arose as early as 1812, when Du Lux went to France, and when she had not seen the respondent since his early infancy. Du Lux wrote to her in that year ^respecting his endeavors to find her nephew. *134 There are some minor circumstances, which may be disposed of in a few words. Her half-brother, Benoit Riviere, a lieutenant in the army, as late as March, 1801, wrote to her, using the address of La Citoyenne Jeanne Icard, at Anére’s, St. Girons. This was eight or nine months after the birth of the respondent; but neither that letter nor one from Lieut. Riviere, without date, which evidently followed it in point of time, makes any allusion to her having been married. But. it is probable he had not been informed of any of the circumstances of her connection with Valentin Ferrié. Frances Gazes, the mother of Valentin, died at St. Girons in January, 1816, and his father, Balthazar Ferrié, at the same place, in August, 1822. Both died intestate, and, in each case, legal proceedings were taken, of which the record remains, for dividing their respective estates among their heirs. Their heirs are named in the documents, and include the descendants of deceased children; and although the respondent was residing at St. Girons in 1816, and had just gone to live at Bordeaux in 1822, he is not mentioned in the papers relating to either of the successions. His connection with the Ferrié family, whose name he bore, was, no doubt, well known to his relatives at St. Girons; and the omission to notice him affords additional evidence that he was not acknowledged by them as legitimate.
It was argued, with great plausibility, by the counsel for the respondent, that the circumstances of the connection of the intestate with Du Lux in France, and their subsequent marriage in 1812, indicate that she must have been the wife of Valentin Ferrié, and thus disabled from marrying another until released by his death. Valentin is supposed to have died in 1811. The omission to marry at the commencement of the intercourse between her and Du Lux, the character of which was never equivocal, and the coincidence of their marriage so soon after the supposed obstacle to it was removed, do, at the first view, give some countenance to the conjecture. But M. Deguerre, who seems to be a respectable witness, testifies in substance that they were married in consequence of a suggestion from him that the manner in which they were *135 living together was not reputable according to the social ideas which prevailed here. Again, there is no evidence that she had ever been informed of the death of Valentin, or that she then had any connection or correspondence with any person at St. Girons through whom the information might have reached her, until after she was married to Du Lux. If we knew that she had been married to Valentin, and that she had heard of his death just before she married Du Lux, it would be fair to Consider that she was influenced by the motives suggested; but in the absence of such preliminary knowledge, the argument is based upon a vague conjecture.
It would not be useful to go at any length over the evidence, respecting the conduct of the intestate towards the respondent in this country for the last thirty years of her life. Her peculiarities of mind and character were so remarkable, that no safe inferences respecting the point in dispute can be drawn from what she said or did. To me it seems that the marks of affection which appear in some of her letters, contrasted as they are with the sentiments of dislike and even hatred which she exhibited towards him at other times, are quite consistent with the supposition that while she entertained the natural feelings of a mother, she felt an utter repugnance towards him as the result of a disgraceful connection with his father, of which his presence continually reminded her.
It has been argued that she has repeatedly affirmed that she had been married to his father, but that is a misapprehension of the evidence. The respondent, who was sworn on his own behalf, related conversations with the intestate in which it seems to have been assumed that he was her son, by a person named Ferrié, but she never told him he was her husband, or that they were married. He says he never asked her such a question. She told him however, she was glad he was dead and “ that he was not much loss.” But it is said she stated that she nad been married to him to several of her acquaintances in Hew York; and Madame Du Fau, Madame Baurans, Mrs. Creighton, Madame Grieser and M. Deguerre are mentioned as the witnesses who prove it. To the first of these persons she admitted the respon *136 dent to be her son, and said that his father was killed on the road from Toulouse to Spain. In answer to a precise question, the witness answers : “ She did not say where she was married to the young man’s father;” but it is not stated that she said she was married to him at all. To Madame Baurans she spoke of the respondent as her son; but the witness expressly says that she never said she was married. Her declarations to Madame Grieser came-the nearest to supporting the allegation. She did say to this woman that she was married in France, when she was quite young, in revolutionary times, and that she had had a child in France also when she was quite young, but she did not say that the respondent was that child. On the contrary, she referred to him in the same conversation as her nephew, nor did she say that the child which she had, was the offspring of the husband whom she married, though it should perhaps be intended that such was her meaning. She declared to Mrs. Creighton that she had a son when she was fourteen or fifteen years old, but she did not say that she was married at that time, and she said the son was' dead, and she did not give the witness to understand that she had ever been married to any other husband than Du Lux. To this witness she always spoke of the respondent as her nephew. To M. Deguerre she admitted, impliedly at least, that, the respondent was her son, and said that his father had been killed by smugglers, but she did not say, and he did not ask her, whether she had been married to his father. He assumed, it is true, that she had been. She pretended to him that the reason why she did not acknowledge him as her son- was that his mature appearance would make her look too old; but this was not a sincere statement, for the plan of calling him her nephew was conceived before Du Lux went to France in 1812, as is shown by his letters to her, and she had not then seen him since he had grown up. She passed him off to Deguerre, as he says, as only sixteen years old and sometimes said he was only fourteen, and yet he was about twenty-four when he came to this country. I do not think that' any satisfactory conclusion can be predicated of her inconsistent and conflicting accounts respecting the respondent. She treated *137 him after he came here for the most part with great harshness and even cruelty, to the extent even of assaulting him in the street, but this arose from her savage temper, and does not raise any important inference upon the question of legitimacy.
My conclusions upon the whole case, are, first, that the documentary evidence shows that the process instituted by Yalentin Ferrié to effect a marriage between himself and Jeanne Icard under the marriage law of 1792 was abandoned, either on account of the persistent opposition of his father, or for some other reason, and an entry in the nature, of a retraxit made, which, whether technical or not, actually put an end to the proceeding before any marriage had taken place; second, that the absence of any entry of an act of marriage in the usual and legal repository of such transactions, and where marriages were at that period actually entered, and which remains and has been inspected, strongly confirms the conclusion deduced from the document first mentioned; third, that the ecclesiastical record of the birth and baptism of the respondent, preserved in the parish church, does not tend to show that he was born in wedlock; but, on the contrary, from its unusual omissions and peculiar language, it furnishes a strong inference against the allegation of a marriage between his parents; fourth, that the subsequent conduct of his parents and the history of the parties down to the death of. the mother, do not furnish any presumption that he was legitimate, but tend strongly to a contrary conclusion. The material features of this last part of the case are, (1.) That the reputation among their friends and acquaintances, at the time of the respondent’s birth, was that his parents were not married, and that he was a natural child; (2.) That when, fifteen years afterwards, he came to live among the relatives of his father and his friends and neighbors, the same reputation obtained, namely, that he was born out of wedlock; and when the death of the father and mother of his father entitled their descendants to a small inheritance, which was divided among them by the local tribunal, the respondent, though being on the spot, or where he could readily have been reached, was not recognized as a party interested in the succession, or *138 noticed in any way. These points are the more conclusive from the consideration that no person has been found who had ever heard any rumor of a marriage between the parents; (3.) That the parents separated, if not immediately, at least very soon, after the birth of the respondent and never lived together, or, so far as is known, ever saw each other after-wards. Ho disagreement is shown to have arisen between them, or any motive for the separation, unless it was that there was no conjugal tie to bind them together; (4.) That the respondent was wholly abandoned by both parents soon after his birth, and was brought up, in poverty and ignorance, by the charity of peasants, and his existence never recognized by his father, nor by his mother until he was twelve years old, and he was not reclaimed by her until two years later; (5.) That, although she admitted to some private friends that he was her son, she gave out publicly that he was only her nephew, and refused to allow him to call her mother, but compelled him to address her as his aunt; and that she never distinctly asserted, even to those, to whom she confided the fact that he was her son, that she had been married to his father.
In my examination of the case I have treated it as one involving purely a question of fact, to be solved by the application of the ordinary legal rules of evidence. Thus viewed, it has seemed to me that there was no good reason to believe that the respondent was born in wedlock. I have only to ' add, that there are no artificial rules or presumptions of law applicable to the case which should prevent us from determining it according to the fact as, from the evidence, we believe it to be. Jllhere is, of course,^^presumption of a marriage merely because its~exisfence is asserted: but where aqperson is found to be the natural, issue of a man and a woman, and nothing else is known~resnecting .thenu-thejp.resumption is in. favor of legitimacy. This, is part of the great rule which pr^yrñe^ state of thinm_rather than s, peculiar and^ exceptmnal__conditiqn'; which supposes legality, rather than crime, ai^d_vfrtue^ndmcm.r&tfí^thm^ttíañrthe oppOsite^TalifresYwíiich demands a construction of evidence, *139 as well as of written language, ut res magis vákat quam pereat.
It is also true, that the amount of evidence to establish a given position is somewhat in proportion to the consequences which are likely to flow from a particular determination; for no tribunal, for instance, would pronounce a man guilty of a capital offence upon the mere preponderance of evidence which would be sufficient to charge him with a debt; and, in questions like the present, where a judgment in favor of one of the parties would attach the stigma of illegitimacy to another, the case against him must be of a very satisfactory character. But there is not, even in cases of acknowledged filiation, any uncontrollable presumption in favor of marriage or legitimacy. It depends upon the facts and circumstances of the particular case. There is one case where, for peculiar reasons, the pre-!, sumption is very strong: Thus, every child born during wedlock, where there is no physical incompetency, is presumed to be legitimate; and this presumption prevails even where the parties are living apart by mutual consent. This was, at one time, considered a conclusive presumption, unless the husband was beyond sea at any time during the pregnancy of his wife; bui the rule has been reconsidered, and it is now held that the presumption may be repelled by evidence of the strongest and most convincing kind, but not upon a mere balance of evidence. (Morris v. Davies, 3 Carr. & P., 217; S. C., 5 Cl. & Finn., 163.) But that case is peculiar, and is founded mainly upon reasons of policy: hence the remarks of Lord Lyftdhubst, in Morris v. Davies, in the House of Lords, quoted by the Surrogate, are inapplicable in a case like the present, in which the question is whether there was ever a marriage between the parents. Again, in Piers v. Piers (H. L. Cas., 331), the marriage was satisfactorily proved, and a long cohabitation had followed, the defect relied on being the absence of a license; and the existence of the paper was presumed, against circumstances of considerable weight against it.
The cases referred to by the learned Surrogate from the French courts, if apposite to the case, would not be useful as precedents for our decision, for it is perfectly established that, while *140 the foreign law is resorted to in order to ascertain what facts are necessary to a legal marriage celebrated abroad, the evidence upon which the existence of these facts is to be ascertained and established, is to be determined by the law of the forum where the litigation takes place. In the cases from our own courts which have been referred to (Fenton v. Reed, 4 John., 52; Starr v. Peck, 1 Hill, 270), marriages were presumed upon slight evidence where there had been a long cohabitation between the parties, though there were some reasons for doubting whether an actual marriage had taken place.
I consider the present case as not affording such evidence as has ever been held sufficient to establish a marriage. I am, therefore, in favor of reversing the judgment appealed from and that of the Surrogate, and of remitting the proceedings through the Supreme Court to the Surrogate, to be proceeded in on the assumption that the respondent was not born in wedlock and consequently was not legitimate.
James, J., delivered an opinion to tne same effect, and Comstock, Ch. J., 'concurred.
Judgment affirmed.